**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Beck Aluminum International, LLC,** | ) | **CASE NO. 1:09 CV 2978** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| **Aluar Aluminio Argentino S.A.I.C.,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

This matter is before the Court upon defendant's Motion to Dismiss and to Compel Arbitration or, in the Alternative, for Summary Judgment (Doc. 14). This is a breach of contract dispute. For the following reasons, defendant's motion to compel is GRANTED.

**FACTS**

Plaintiff, Beck Aluminum International, LLC, brings this lawsuit against defendant, Aluar Aluminio Argentino S.A.I.C., alleging that defendant breached the parties' 2009 contracts to sell plaintiff aluminum ingots when defendant refused to supply the ingots under the terms of the contracts into which the parties allegedly entered. The parties have engaged in limited

1

discovery and the following facts are taken from the complaint as well as the exhibits submitted by the parties in support of their briefs.[1]

Plaintiff, a resident of Ohio, is a distributor of aluminum ingots to customers in parts of the United States, Mexico, and Canada. Defendant, a resident of Argentina, is a large producer and exporter of aluminum. Plaintiff has purchased aluminum from defendant since at least 2006, although purchases prior to 2008 were limited to spot transactions. In 2007, the parties negotiated a year-long agreement for 2008, according to which defendant would supply plaintiff with 300 metric tons of aluminum alloy per month in 2008. The 2008 agreement was negotiated primarily through a series of emails and did not result in a formal written contract. In the fall of 2008, the parties began to negotiate 2009 terms for plaintiff's purchase aluminum alloy and P1020 aluminum, an aluminum product plaintiff had not previously purchased from defendant.

The parties once again conducted negotiations through a series of emails, but dispute what constitutes the terms of the final contracts. Plaintiff maintains that the P1020 agreement was finalized on October 29, 2008, according to the terms in an October 28 email sent by plaintiff to defendant. Defendant, on the other hand, maintains that the P1020 agreement consists of a three-page document (the "P1020 written contract") originally emailed from defendant to plaintiff on November 4, 2008.

With respect to the P1020 agreement, the evidence establishes the following. On October 28, 2008, Greg Gershuny, plaintiff's employee, sent an email to Rick Naus, defendant's agent, asking him to confirm defendant's agreement to a list of commercial variables after

---

[1] When considering a motion to compel arbitration, the Court may appropriately "look beyond the complaint at pleadings and documents submitted by either party." *Anderson v. Delta Funding Corp.*, 316 F. Supp. 2d 554, 558 (N.D. Ohio 2004).

Naus's conversation with Alejandro Luduena, defendant's marketing development manager. The list included quantity, price, payment method, and place of delivery for both P1020 and alloy. The following day, Gershuny prepared a Purchase Origination Contract reflecting these terms for P1020, which stated that the contract had been confirmed with Naus. Gershuny also testified that he confirmed these terms with Naus. The Purchase Origination Contract was strictly an internal document and was not provided to defendant. Plaintiff also prepared purchase orders for P1020 dated October 31 and signed by plaintiff on November 4 and sent them to defendant. The purchase orders contained the following term:

> This order is not binding until accepted by the seller either by seller's signed acknowledgment or seller's commencement of performance and such acceptance may only be on the exact terms and conditions set forth on the face hereof, and any purchase supplement attached hereto. No additional terms or conditions or modifications will be effective unless in writing and signed by buyer's authorized representative.

On November 4, 2008, defendant sent an email to Gershuny attaching a written contract for the sale of P1020 which stated: "Please find attached the contracts for the business closed for year 2009. Would appreciate your issuing them in two sets and sending those to us with your signature. Will return you one with our signature." The contract contained a typographical error stating that Noble Americas Corporation was the buyer. The "material" term stated "Primary Aluminum Ingots P1020." The quantity term stated "Total of 6,000 Mt (+/- 2%) monthly from january [sic] until december 2009 [sic], monthly volume 500 Mt." The contract also contained the following arbitration provision:

> This Agreement shall be governed by the laws of the State of New York. Any claim whatsoever by either party shall be notified in writing to the other so that such notice shall be received within sixty (60) days after the arrival date of the vessel to the port of

3

> destination.  Any dispute arising out of or under this Agreement
> shall be settled by Arbitration in the State of New York.

Gershuny requested that the typographical error be corrected to read Beck Aluminum International as the buyer.  He further requested that the "material" term be changed to read "300 MT Tee Bar and 200 MT Ingots/month.  Any change to this allotment to be notified 2 shipment months in advance."  Later that same day, defendant emailed an amended contract to Gershuny with the typographical error corrected, the material term stating "Primary Aluminum Ingots P1020," and the quantity term stating "Total of 6,000 Mt (+/- 2%) monthly from january [sic] until december [sic] 2009, monthly volume 500 Mt.  300 MT Tee Bar and 200 MT Ingots.  Any change to this allotment to be notified 2 shipment months in advance."  Plaintiff made no further objections to the amended written contract.

With respect to the alloy agreement, plaintiff argues that it was finalized on November 4, 2008.  Defendant maintains that the alloy agreement was not finalized until December 23, 2008.  The evidence establishes the following.  As set forth above, on October 28, 2008, Gershuny sent an email to Naus asking him to confirm defendant's agreement to a list of commercial variables for both P1020 and alloy after his conversation with Luduena.  The quantity variable for alloy, however, was expressed as a range of 100 to 200 metric tons.  On October 30, 2008, Gershuny sent another email to Naus that stated "Please see our bid below" and proposed 160 metric tons of alloy per month for 2009.  Naus inquired on November 4, 2008, if plaintiff would accept 100 metric tons each of two different types of alloy per month.  Gershuny responded affirmatively.  Later that same day, Gershuny sent another email to Naus asking him to confirm the understanding that the parties would renegotiate the premium on a quarterly basis.  According to an email sent from Naus to Luduena, Gershuny then called Naus on the same day and wanted to

4

change the agreement from December 2008 to June 2009 and renegotiate the premium after six months.  Additionally, on November 4 Gershuny prepared an internal Purchase Origination Contract reflecting the six-month term and that the premium would be renegotiated for the July 2009 to December 2009 business.  Plaintiff also prepared purchase orders reflecting these terms, which were signed on November 11 and sent to defendant, containing the same term as the P1020 purchase orders discussed above.  On November 18, however, defendant responded that it would not agree to a six-month deal, and if plaintiff agreed to the one-year deal, defendant would "issue the contract as per the agreement."  Plaintiff agreed to abide by the one-year term in an email to defendant on November 28.  Gershuny emailed defendant again on December 8, stating that plaintiff had not heard from anyone regarding the confirmation of the contract and to please respond as soon as possible.  Naus responded the same day that given the holiday in Argentina, "it is an oversight on the formal contract being forwarded."  Defendant then responded on December 10 that the business was confirmed.

On December 16, 2008, defendant emailed the alloy written contract to plaintiff.  The contract contained the same arbitration provision as the P1020 contract discussed above.  Gershuny responded on behalf of plaintiff and objected to the premium listed in the contract.  He stated that the premium should be "MW+8.5 cents" instead of "LME+13.5 cents."  He also objected to the "Documents" section, stating that the "'documents' section is all wrong.  Not the way it works at all.  Please amend and resend."  Naus responded on December 19 that the premium was correct and that he wanted more detail regarding what was wrong with the Documents section.  On December 23, Gershuny emailed Naus on behalf of plaintiff: "We accept the terms as written minus the language for payments/documents.  It should reflect how

5

we have been doing it for all of this year. We will send our idea ASAP." Plaintiff presented no further objections to the alloy written agreement, nor was any evidence presented that plaintiff sent further amendments to the Payments or Documents section.

During the time when the parties were negotiating for 2009, plaintiff began to default on its obligations under the 2008 agreement. In January of 2009 defendant refused to ship under the 2009 agreements because of the outstanding 2008 balance. On April 6, 2009, plaintiff sent an email to defendant requesting that defendant begin shipping under the 2009 agreements, and attached the purchase orders for 2009 shipments of P1020 and alloy as well as a signed copy of the alloy written contract, back-dated to November 4, 2008. No evidence was presented that defendant signed the purchase orders sent by plaintiff either in the fall of 2008 or the copies sent on April 6, 2009. Despite attempts to resolve the issues, the parties ultimately did not perform under the 2009 agreements, and plaintiff filed this suit on December 23, 2009.

The complaint contains four claims for relief. Count one is a claim for breach of contract. Count two is a claim for fraud in the inducement. Count three is a claim for negligent misrepresentation. Count four is a claim for promissory estoppel.

Defendant now moves to dismiss the complaint, arguing that the parties agreed to arbitrate any dispute arising from the 2009 agreements. Plaintiff opposes the motion.

**STANDARD OF REVIEW**

The Federal Arbitration Act ("FAA") applies as this is a transaction in commerce. The FAA provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof,

> or an agreement in writing to submit to arbitration an existing
> controversy arising out of such a contract, transaction, or refusal,
> shall be valid, irrevocable, and enforceable, save upon such
> grounds as exist at law or in equity for the revocation of any
> contract.

9 U.S.C. § 2.  The FAA embodies a clear federal policy requiring arbitration unless the agreement to arbitrate itself is revocable.  *Perry v. Thomas*, 482 U.S. 483, 489 (1987).  "[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration."  *Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983).

> The Arbitration Act establishes that, as a matter of federal law,
> any doubts concerning the scope of arbitrable issues should be
> resolved in favor of arbitration, whether the problem at hand is the
> construction of the contract language itself or an allegation of
> waiver, delay, or a like defense to arbitrability.

*Id.* at 24-25.

When considering a motion to compel arbitration, if a court is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."  9 U.S.C. § 4.  *See also Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 400 (1967).  In ruling on a motion to compel arbitration,

> Section 4 of the Arbitration Act requires the court to engage in a
> limited review.  The first step of that review is to determine if a
> valid agreement to arbitrate exists between the parties.  If a valid
> arbitration agreement exists, the court must determine if the
> specific dispute falls within the substantive scope of the
> agreement.

*Harmer v. Doctor's Associates, Inc.*, 781 F.Supp. 1225, 1228 (E.D. Mich.1991) (internal

7

citations omitted). *See also AT&T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 649 (1986) (holding that "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims"). A motion to compel arbitration should be granted "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960). While the court considers the facts in the light most favorable to the plaintiff, ultimately the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration. *Green Tree Fin. Corporation-Alabama v. Randolph*, 531 U.S. 79, 91 (2000); *Anderson,* 316 F. Supp. 2d at 558.

## ANALYSIS

In this case, plaintiff does not dispute that its claims are within the scope of the arbitration agreement, but argues that the P1020 written contract and the alloy written contract, which contain the arbitration provisions, are not valid enforceable contracts. Moreover, the parties do not dispute that contracts exist, but dispute whether the terms are those in the emails from the plaintiff to defendant on October 28, 2009 and November 4, 2008 or those in the written contracts.[2]

The parties agree that the Uniform Commercial Code (U.C.C.) applies to any contract for

---

[2] Plaintiff states in its opposition that defendant disputes the existence of a contract. This is inaccurate– both parties maintain that a contract existed, but dispute whether the terms of the contract were the terms in the email exchanges or in the written contracts.

8

the purchase and sale of aluminum in 2009.[3] The U.C.C. provides:

> (A) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.
>
> (B) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.
>
> (C) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

Ohio Rev. Code § 1302.07; N.Y. U.C.C. Law § 2-204.

Further, under the U.C.C., where a written confirmation of agreement is sent between merchants, the following provisions apply:

> (A) A definite and seasonable expression of acceptance or a written confirmation that is sent within a reasonable time operates as an acceptance even though it states terms additional or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> (B) The additional terms are to be construed as proposals for addition to the contract. Between merchants, the terms become part of the contract unless one of the following applies:
>
>> (1) The offer expressly limits acceptance to the terms of the offer.
>>
>> (2) They materially alter it.
>>
>> (3) Notification of objection to them has already been given or is given within a reasonable time after notice of

---

[3] The parties appear to dispute whether Ohio law applies or New York law applies. Defendant maintains that New York law applies according to the choice of law clause in the written agreements, while plaintiff applies only Ohio law in its arguments. The Court finds that Ohio law and New York law are the same on the issues at hand, thus choice of law makes no difference to the outcome in this case.

> them is received.
>
> (C) Conduct by both parties that recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case, the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of Chapters 1301., 1302., 1303., 1304., 1305., 1307., 1308., 1309., and 1310. of the Revised Code.

Ohio Rev. Code § 1302.10. *See also* N.Y. U.C.C. Law § 2-207.

Defendant argues that the parties agreed to arbitrate the disputes at issue. Defendant argues that plaintiff never objected to or requested any changes to the arbitration provision in either contract. Defendant further argues that plaintiff unequivocally accepted this provision when plaintiff sent a copy of the alloy written contract signed by plaintiff to defendant in April 2009 and requested that defendant begin to ship goods under the "2009 Agreements."

Plaintiff, on the other hand, argues that the parties intended that the written contracts be signed by both parties before the contracts became enforceable. Because the P1020 written contract was not signed by either party and the alloy written contract was signed only by plaintiff, plaintiff argues that the arbitration provision is unenforceable as a matter of law. Plaintiff also argues that the 2009 written contracts were not presented to plaintiff until after the 2009 email contracts were confirmed and are thus unenforceable. In support, plaintiff points to the parties' prior course of dealing, in which the parties considered the exchange of emails to be a commercial agreement. Plaintiff additionally states that consistent with past practice, plaintiff completed internal Purchase Origination Contracts according to the email terms and sent purchase orders to defendant reflecting these terms before defendant presented plaintiff with the written contracts. Plaintiff also states that while it subsequently attempted to amend the alloy

10

deal to renegotiate the premium in six months, it ultimately abandoned the amendment and the original November 4, 2008 deal was reconfirmed on December 10 before defendant presented plaintiff with the alloy written contract on December 16.

Defendant replies that plaintiff knew and understood that defendant intended for the 2009 agreements to be in writing.  In support, defendant points to Gershuny's deposition testimony in which Gershuny acknowledges that defendant informed him at least two or three times in writing that a formal contract would be issued for the deal, and to several email exchanges in which defendant refers to issuing the contract or attaches written contracts. Defendant also points out that plaintiff received, reviewed, and provided comments to the written contracts and did not reject or object to the arbitration clause, and that plaintiff accepted the terms of the written contracts in writing.  Defendant additionally argues that the arbitration clause is enforceable even though plaintiff did not sign the P1020 written contract, because plaintiff accepted the alloy written contract in writing and because the parties are merchants under the U.C.C., thus the terms in the written contracts became part of the parties' agreements. Defendant further argues that plaintiff's internal Purchase Origination Contracts do not evidence enforceable contracts because they were never sent to defendant, and that plaintiff's purchase orders are not enforceable contracts because they were never signed nor performed by defendant as required by the terms of the purchase order to show acceptance.  Finally, defendant argues that even if the email exchanges formed binding contracts prior to plaintiff's acceptance of the written contracts, the parties agreed under the U.C.C. to modify the email contracts to include the arbitration provision.

Upon review, the Court finds that the arbitration provisions in the written contracts are

11

enforceable. The P1020 written contract in this instance operated as a written confirmation of the parties' agreement under Ohio Rev. Code § 1302.10 and N.Y. U.C.C. Law § 2-207. Both parties are merchants under the U.C.C.[4] Defendant sent the written contract within four business days of plaintiff finalizing the terms of the contract with Naus, and while plaintiff argues that this was after the terms of the contract were already agreed to, plaintiff does not argue that this was not within a reasonable time under § 1302.10(A) or § 2-207(1). Therefore, the additional provisions in the P1020 written contract became proposals for additions to the parties' contract under § 1302.10(B) and § 2-207(2). Plaintiff reviewed the written contract and made objections to other provisions but did not at any time object to the arbitration provision, nor does plaintiff argue that the arbitration provision materially alters the parties' agreement.[5] The arbitration provision thus became part of the parties' contract under § 1302.10(B) and § 2-207(2).

Plaintiff's argument that it never signed the P1020 contract thus the arbitration provision is unenforceable is not supported by law. Ohio and New York courts have held that "where parties have agreed that a contract shall not be binding until signed by a particular person, party, or official, courts will give effect to that agreement, and thus will not enforce the contract without the requisite signatures." *Allen v. Ford Motor Credit Co.,* 8 F. Supp. 2d 702, 705 (N.D.

---

[4] "Merchant" means a person who deals in goods of the kind or otherwise by the person's occupation holds the person out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by the person's employment of an agent or broker or other intermediary who by the agent's, broker's, or other intermediary's occupation holds the person out as having such knowledge or skill. Ohio Rev. Code § 1302.01(5). The definition under New York law is similar. N.Y. U.C.C. Law § 2-104(1).

[5] The parties do not address, and the Court expresses no opinion on, whether any other additional terms included in the P1020 written contract materially altered the parties' agreement.

Ohio 1998) (citing *Richard A. Berjian, D.O., Inc. v. Ohio Bell Tel. Co.,* 375 N.E.2d 410, 413-414 (Ohio 1978)).  *See also Scutti Pontiac, Inc. v. Rund,* 402 N.Y.S.2d 144, 148 (N.Y. Sup. Ct. 1978).  But there is no evidence of such an agreement between the parties in this case.  The P1020 written contract does provide spaces for the signatures of both parties, but signature spaces in a contract "'do not in and of themselves require that signatures of the parties are a condition precedent to the agreement's enforceability.'"  *Allen,* 8 F. Supp. 2d at 705 (quoting *Berjian,* 375 N.E.2d at 413).  The written contract itself also does not include a provision stating that it will not be binding unless it is signed by the parties.  *Id.*  Plaintiff points to Naus's testimony that he believed both parties had to sign the written contract for the contract to be binding, but this after-the-fact testimony of what Naus believed to be required for a contract to be legally binding does not establish any agreement between the parties as to the effect of the unsigned contract.  Similarly, Luduena's October 20, 2009, email to plaintiff that neither the P1020 written contract nor the alloy written contract were binding on defendant because defendant had not signed them does not establish any agreement between the parties that the written contract would not be valid unless signed.  Accordingly, the arbitration provision of the P1020 written contract is enforceable.

The Court also finds that the arbitration provision of the alloy written contract is enforceable.  Contrary to plaintiff's argument, the evidence does not support that the parties came to an agreement on alloy for 2009 on November 4, 2008.  The parties continued to negotiate through November 28, 2008, and defendant accepted the terms of the agreement on December 10.  As with the P1020 written contract, defendant's alloy written contract operated as a written confirmation of the deal sent within a reasonable time under § 1302.10(A) and § 2-

207(1).  Plaintiff unambiguously accepted the additional terms in the alloy written contract in its December 23, 2008 email, as it maintained its objections only as to the Payment and Documents portion of the written contract.  Plaintiff has also not argued that the arbitration provision materially alters the parties' agreement.[6]  Because plaintiff accepted the additional terms, and for the reasons set forth in the discussion of the P1020 written contract, plaintiff's argument that the document was not signed by defendant and is therefore unenforceable fails.  Accordingly, the arbitration provision of the alloy written contract is enforceable.

Further, the Court finds that plaintiff's claims are within the scope of the arbitration agreement.  Under federal law, unless the dispute can be "maintained without reference to the contract or relationship at issue," it must arbitrated if a valid arbitration clause exists.  *Nestle Waters N. Am., Inc. v. Bollman,* 505 F.3d 498, 504 (6th Cir. 2007).  Plaintiff's claims are premised on defendant's failure to ship aluminum according to a contract or a promise and thus fall within the scope of the arbitration agreement.  Plaintiff does not dispute that its claims are within the scope of the agreement.  Accordingly, defendant's motion is granted and the case is dismissed.

**CONCLUSION**

For the reasons set forth above, defendant's Motion to Dismiss and to Compel Arbitration or, in the Alternative, for Summary Judgment is GRANTED.

IT IS SO ORDERED.

---

[6] As with the P1020 written contract, the parties do not address, and the Court expresses no opinion on, whether other additional terms in the alloy written contract materially alter the parties' agreement.

        /s/ Patricia A. Gaughan
        PATRICIA A. GAUGHAN
        United States District Judge

Dated: 8/18/10